Good morning, Your Honor. I'm Travis Berry on behalf of the appellant, John Witherow. If you'll help me, I'd like to reserve a mere two minutes under duty. We'll try to help you, but keep your eye on the clock. Okay. I would like to make a brief and what I consider eloquent opening, and then entertain the questions from the bench, if I may. Your Honor, it depends how long the opening lasts. I did say brief, sir. I did say brief, Your Honor. Okay. It is now eloquent, it is. Yes, it is. Fair enough. You be the judge. The entire time, Mr. Witherow was in prison. It's the Department of Corrections that really was imprisoned by the Fourth Amendment. The entire time, they're limited in what they can do by the strictures of the Fourth Amendment, which are stronger than bars, gates, fences, locks. So them listening to attorney-client calls starts out as a Fourth Amendment violation, and the only way they can justify that behavior is by qualifying for the limited exception under Tather. And so that's the question that we want to address today. But my understanding is the court's going to ask me, did the district court err in summarily dismissing Mr. Witherow's Fourth Amendment claim tonight, correct? All right, Sergeant. Yes. Good question. Did the district court err in summarily dismissing Mr. Witherow's Fourth Amendment claim? And we say for sure. This court reversed that dismissal of the Fourth Amendment claim and remanded. And that means that dismissal of the Fourth Amendment claim was null and void. Did you say that because of Rule 56.5, because no notice was given, or you're just saying because of the summary judgment standards? I'm going to take both of those. Okay. There was no notice given. And it's interesting. The dismissal of the Fourth Amendment claim happened somewhere in 2010 or 11 prior to trial, prior to significant pleadings. And so a lot of things transpired between the time that that Fourth Amendment claim was dismissed and when the district court then turned around without pleading or briefing, summarily dismissed his Fourth Amendment claim. Now, I can't imagine a better segue than having the Nordstrom case in front of us, because we're not talking about here about outgoing mail. You didn't get a letter from Mr. Nordstrom, did you? No, sir. Okay. Good. I get lots of letters from inmates, but not one from Mr. Nordstrom. The Taylor standard is very, very low. We acknowledge that the courts give the correction systems incredible deference, don't want to tell you how to run the joint. So it's a really, really low standard, we understand. But it's still a standard. It has to be met or it's meaningless. And we're running up against here this insatiable paranoia of the Department of Corrections. Let me just ask you this. It seems to me you have raised two pretty good arguments, Rule 56F and the summary judgment standard, neither of which gets to the merits. We can talk about the merits if you want to, but your argument, I gather, is procedural in nature, isn't it? It is, but we're really here because we want to play a client. We want a real line. You cannot listen to attorney-client calls for any reason. So we're asking this court to just decide it. You cannot do that. That is a Fourth Amendment violation. Let's sit for a moment that even if we wanted to, we have to have a lower court determination, have the facts laid out, and that's one of the problems we have here, right? It is. So how can we decide that until a trial court has had the evidence presented and then we can review it? Well, I was hoping you'd use some of your brilliant law clerks to do that here. We'd make up the facts. Well, I think there's plenty of facts in your record. That's what this is all about. You said they're already in opinion by a panel. It's just that there weren't enough facts. It's back to the district judge to talk about the facts. Exactly why I think we're done here on our part, because this has to be remanded for briefing, continued briefing on the Fourth Amendment claim. There's plenty of things that we could have brought up in the district court if we'd been given the right and the opportunity. For example, the basis, the rationality of the Department of Corrections used to justify listening into Mr. Rutherford's calls was the same thing that you brought up in the Nordstrom case, this imagination of this mill set, right? Well, the imagination actually is a little easier here. If this case does go back, it'd be useful for both sides. We're going to give the attention to the kind of record that was developed in the Nordstrom case, and it's all teed up for us. And it's a problem here not having much of a basis, but it does make a lot of imagination to perceive the difficulty with telephone calls, which is that, and indeed I have some knowledge in this subject of the difficulty of making calls. Some inmates want to make calls to certain people they can't call. They can't call their attorney, and then the attorney says, oh, can you give me over to my bud? I want to get the phone once this week, and this is my time, and so forth. And the attorney, not thinking about anything illicit, connects him to his mother or brother or whatever. And that's when the conversation gets a lot more interesting and has nothing to do with representation by counsel. How is the prison supposed to guard against that if, in fact, they can't do anything once the call is in a shooting place to an attorney's office? Is the technology for forwarding the call to somebody else readily available? Well, if it's ever happened, there's nothing of that in the record, right? There's nothing in the record. Now, but that theoretical problem is a whole lot less theoretical and more practical to me than some of the concerns we talked about in the last case, and I think it needs to be addressed. I mean, is there a system the prison can use that you think would pass constitutional muster and yet would also prevent the scenario I just described? No. I think that's why we need a black line. That's why we need a black line. You simply cannot listen to it. You just told me there's a black line that you want to draw that prevents the prison from doing anything to prevent a forwarded phone call. Listen, Your Honor, it just seems improper to use outliers to make policy because they're over-explicit and over-broad, and they actually interfere with the mass and the bulk of the individual. The whole criminal code is based on preventing outliers, i.e. criminals, from doing things. In your population here, the whole prison is filled with people that have demonstrated they're willing to be outliers. Right. So they're not necessarily going to adhere to the rules. But the players are. That's the other side of the conversation. That's the members of the bar. Yeah, but if a member of a bar is asked to connect prisoner X to his mother, what's an easy thing to do? It doesn't seem on its face to be a problem, only it turns out his brother lives with his mother, and his brother's the guy he's conspiring with. So at least theoretically, and we don't have enough facts here to speak to, I think there's a greater concern here. At least it seems to me there's a basis for a greater concern here. And if a case goes back, that's something that your side's going to have to give some attention to as well. So that attorney's a dope, okay, if he does that. Because there are more dope attorneys than dishonest attorneys. I'm not going to say that I know anybody that resembles that remark. But we've seen them in this courtroom. Okay, so that's the rational basis for supposing the need to listen. But in this case, it's even more horrible. Because Mr. Witherow's telephone calls were with his attorneys about cases where the Department of Corrections staff were the defendants. They wanted to know what he was saying. They were dying to know what he was saying. Hold on just a minute. I'm still hung up on some things that we left five minutes ago, because I'm just a trial judge and I'm a little bit slow. One of the things that's really got me hung up here is we have a panel that says the record's not fully developed. And whatever else has to happen has got to go back and be fully developed. And this judge says, well, I examined the trial record, and I'm now going to write this opinion because I believe the record's developed enough. But you tell me that the Fourth Amendment claim disappeared before the trial and that there's other information that would have been developed that the Fourth Amendment claim would have been tried. And at that point, the discussion we're having now, like what might be the other less restrictive alternatives, what might be the exact nature of the problem, it's just never been developed. And so what we're talking about here are theories that people are building castles in the sky. And how can we decide the keys on that? I mean, is it just a case of surprise? I'll say, go back, develop a record, and let us decide this thing based on what's real rather than imaginary. I mean, no black lines. Go back, develop a record. Your Honor. Exactly. And I think I will avoid stealing victory from the jaws of defeat. Rest. There's no more of the questions. I'll bring it to you. Okay. Thank you. I just hope you'll save the balance of your time if you choose to use it. Okay. We'll hear from the State. Good morning, Your Honor. May it please the Court. Jordan Smith on behalf of the State of Nevada at Belize. And I'll start with the procedural issues that Your Honor seemed to be having and see if I can provide some clarity here. The Knight Survey panel did not remand this matter because it didn't help to develop a more full-fledged record. In fact, the Turner issues and elements were all cited and fully argued and briefed in the defendant's motion for summary judgment. And, in fact, Mr. Witherell's motion for partial summary judgment. Counsel, with respect, this was a Rule 56 def motion, which requires notice and a reasonable time to respond, right? Yes, Your Honor. But all these issues were fully argued and briefed. You're still asking at a different point. Okay. With a different part of the proceeding. Yes, Your Honor. As of February 56, after the proceeding was concluded, when was notice and a reasonable time to respond given in this case? Back in 2011. And I think some clarity is also provided by looking at the district court's motion for summary judgment and the magistrate's report recommendation. The specific passage I'm referring to can be found on page 56 of this record, where the magistrate says she specifically didn't need to reach the Turner legitimate institutional security concerns because she was ruling on the more narrow grounds that Mr. Witherell, or I guess the first step, that Mr. Witherell didn't have a reasonable expectation of privacy. Let me be sure I understand your point, Counselor. Are you saying that if there's a proceeding, we'll call it time period one, and certain things are discussed, and then you have a 56-F motion in period two, that the notice and opportunity to respond for 56-F can relate back to the earlier proceeding? Is that what you're saying? By the way, they were only discussed once in the trial. You don't have to do it again. Is that what you're saying? Yes. In these particular types of circumstances where the magistrate and district court judge could have made an alternative ruling, they determined Mr. Witherell didn't have any Fourth Amendment rights at all, so they didn't need to reach the Turner step to determine whether those rights could be restricted. As the question was specifically briefed and argued and reserved in the motion for summary judgment proceeding, the magistrate judge and district court could have made alternative rulings at the time and said, I find Mr. Witherell has no Fourth Amendment rights, but even if he did, I find that the practice was reasonably related to a legitimate penological interest. And where's the record underpinning for that claim? That was in the motion for summary judgment proceeding in the briefing. What evidence? You were sitting here for the Nordstrom argument. The kind of evidence was developed there and so forth. What evidence is there here? The specific declarations Mr. Witherell has included from the original underlying motion for summary judgment briefing and this record, they're available to the court in the 2013 record on appeal. You're telling us to sustain the summary judgment, but you're telling us you've got to go back and look at a prior appeal to figure out what the record was? The declarations in those appeals, that's correct. And I can give you the record citations to those. The defendants cited Turner, briefed all the issues. Mr. Witherell in opposition to that motion for summary judgment made the same alternate comment. Is there any evidence of improper phone calls that are accepted through this technique? Yes, Your Honor, and that's actually in this record at page 864. Officer Baker's discovery response has said that she personally discovered inmates making personal calls under the guise of legal calls. That's in this record. The declarations in support of the summary judgment briefing, again, in the previous record on appeal, are available to the court. Court Donnett, Officer Baker, Officer Connelly all describe that a con inmate's making personal calls under the guise of legal calls, Mr. Witherell himself, was conned and disciplined for making a personal call to his mother under the auspices of calling his attorney. During the intermittent checking in, one of the officers conned him talking to his mother about Timothy McVeigh, and he was actually disciplined for that. So there is a record here, both in the discovery responses, which are a part of this record, and the declarations in support of the previous motions for summary judgment in the 2013 appeal demonstrating that there is a factual basis here in support of the Turner factors, and that's what the magistrate judge recognized when ruling on the motion for summary judgment in the first place. But again, she ruled that there was no Fourth Amendment implication at all, so she didn't need to reach Turner. She could have, again, made alternative rulings, which the district court could or could not affirm. But when the case was remanded back to the Ninth Circuit, all the district court had to do, and what the district court did in fact do, was pick up the summary judgment briefing, look at the grounds that were specifically reserved, or could have been addressed but were reserved, and make a ruling on that factual record that was presented here, and that's exactly what the district court did here. So I look at what the district court did here, and it's an accident, but the juxtaposition from the findings, in fact, and conclusions of what we had in the Nordstrom case is kind of striking. I look at this, and it gives me a bottom line conclusion, but I don't see anything cited to explain the finding or anything identified as a, quote, finding of fact, that in fact there has been experience in the Nevada system with prisoners making calls. It's fuzzy because there are lots of ways you can say you're going to call your lawyer and then call somebody else, focusing, again, on calls actually made to attorneys. I did look quickly at the record reference you gave me, and it's more like the first school, not the second. Prisoners saying they're going to make a legal call to call somebody else. I'm focused on what evidence is there of problems with phone calls made to counsel, and then they let us trace them. Well, Your Honor, in your initial question, you kind of identified the problem. You do spot checking in the ease with which somebody can call their attorney. Well, I understand the theoretical problem. My question is what is there in the record that gives the basis for a finding not articulated by the district court that, in fact, Nevada has had experience like that? There's nothing in the record that has a specific instance where an attorney has forwarded the call to somebody else. But I think what the U.S. Supreme Court said in Thornburg with regard to the fourth Turner factor is that the fears are reasonably grounded, and the prisoner doesn't have to be reactive and wait until it's too late, especially when the security interest involved in the exchange of contraband information, as the district court called it, is so great that the prison isn't required to sit back and wait until there has had an incident before it can institute this policy. The Thornburg says that the fourth Turner factor, if there's a reasonably grounded fear here, then the prison system, the monitoring system, can be considered reasonable. And there's a reasonably grounded fear here, as Your Honor pointed out, that this can happen, and it's in the record that this has, in fact, happened or declared. Now, this is, again, not necessarily an attorney-related call, but that monitoring has stopped inmates being involved in a murder plot, discovering information that guards an inmate compromised. So this is a legitimate security concern. But the U.S. Supreme Court recognized in Turner itself by saying that inmate communication can spur criminal activity in its legitimate interest to try and prevent that. But if you look at the whole attorney-client relationship, everything that you just said would be exactly the same argument that could be made for monitoring an inmate person face-to-face meeting between a lawyer and his client. There are other bad people that meet with defendants. They plot nefarious schemes. They go out and do bad things. Therefore, we need to monitor the face-to-face meeting between a lawyer and a client, and you should have no reasonable expectation of privacy based on that. There's just no difference between your argument. It's if one would lead absolutely to the next. There is a difference, Your Honor, because there are two interests here. One being the security interest, and I see your point with regard to that. But the other interest here is these inmates have limited number of personal calls. And there's substantial evidence in the record here that people were evading the limitation on personal calls by declaring them illegal phone calls. And wouldn't a reasonable alternative be that the prison guard finds out who the call is going to be placed to and ensures that it is a law office, places the call directly to the lawyer, makes sure that the person on the other side is the lawyer, and then hands the phone over? That is one alternative. But Turner is clear that this is the least restrictive means test. And the U.S. Supreme Court said in Wolfe v. McDonald that it is too burdensome to require the prison, every time they get a letter, call a law firm and say, did you really send a letter? The U.S. Supreme Court said in Wolfe that that's too burdensome. So while that may be one alternative, this is the least restrictive means test, and it has to have a diminished effect on prison administration and prison resources. There is evidence in the record, a report done to testify that they didn't have enough manpower, for instance, to stand over an inmate and watch them make a phone call. That's in the 2013 record on appeal in 2642. Officer Baker said the same thing in the first record on appeal in 2648. So there's evidence in the record that other instances were just not available due to the resources, which really go to the third and fourth Turner factor. And also I'd like to point out an interesting feature of the second Turner factor. That needs a little bit of clarification from the district court's decision. The second Turner factor is there has to be alternative avenues available to exercise the right. This court said in Wolfe v. City of San Francisco in 2010, and also in the Sumner case from 1988, that the second Turner factor doesn't really apply in the Fourth Amendment context because there's no alternative means really of being free from unreasonable searches and seizures. But the panel's decision before remand says something interesting. It says that Nevada cannot defeat an inmate's constitutional right through a confidential attorney-client communication. That passage could be read as recognizing for the first time that there actually is a constitutional right to an attorney-client communication. This court, going back to 1985, when the Clichet v. Rushing case, and all other circuits that I'm aware of, have found that the attorney-client privilege is merely a rule of evidence. It's not a constitutional right. So the second Turner factor, if viewed properly in this case as a Fourth Amendment case, the second Turner factor is inapplicable. But if the panel's decision is read as recognizing for the first time anywhere that I'm aware of a constitutional right to an attorney-client communication, there all are two alternate means of exercising that right in jail by in-person meetings. But again, limiting attorney-client communications with inmates to in-person meetings would severely restrict an inmate's ability to meet and get assistance at legal counsel. Mr. Witherow's own attorney testified at trial, Mr. Yeager, that he had a policy of not going to the prison because it was too time-consuming, and I imagine most other attorneys do as well. So any sort of alternative that would limit an attorney-inmate communication to in-person would severely restrict that. The panel's decision instructed the district court to focus on policies. Mr. Witherow hasn't suggested any alternative policy. All that he has suggested is it's a caller ID apparatus, and it's more of a technological issue and not a policy change, to the extent there is any policy implications. It would be that there's no monitoring whatsoever. But again, a lack of monitoring would create security concerns and also the concerns about invading of limitations on inmate personal calls. Do you think that Mr. Witherow might, in fact, argue that he never was able to put forward the policy positions because he was never given notice that the judge was going to make the decision? No, Your Honor. He could have put forward all these alternative policies and addressed the turn of factors in the 2011 summary judgment briefing. Again, it was signed and briefed in response to the motion for summary judgment and his own motion for partial summary judgment. He's not explained his court reviews this matter enough. He's not presented what he wasn't able to present or shown any evidence. And he certainly hasn't explained why he wasn't able to present that back in 2011 when this issue was first teed up to the judge. So to the extent there was any sort of procedural irregularity here, he hasn't shown any prejudice. But again, I don't think there was any procedural irregularity here because he had a full and fair opportunity to brief Turner, brief all these issues, present all the evidence he had. When the summary judgment motion was initially teed up, the magistrate judge could have ruled on those grounds that Joseph just stopped after finding there was no Fourth Amendment implications whatsoever. But she could have briefed Turner at that point because it was fully briefed. Oh, if she had, then it would have been more likely that when the case went on to the district court, there would have been more attention paid to the issues that now turned out to be dispositive. I disagree. Summary judgment was at the end of discovery here. So this wasn't like an early motion for summary judgment where discovery wasn't conducted on these claims. The papers to the district judge, and I haven't looked at them, the papers to the district court after the magistrate's report, did they focus on the issue found dispositive by the magistrate or did they focus on issues not ultimately found dispositive by the magistrate judge? They focused on the issues found dispositive by the magistrate judge. Okay, so that's what's in front of the district court, not what you're asking us to decide upon, not what the district court actually decided upon upon remand. What puzzles me here is why the district court wouldn't at least invite the parties to address the issues before rendering a decision. That never happened. And it may not be necessary to reopen the record should there be an opportunity to address the issues to the district court before the district court decides if they weren't addressed before to the district court. I don't think so, Your Honor. The issues have been fully briefed. The issues have been fully briefed. But he just told me that, no, the brief, I mean, perhaps fully briefed to the magistrate judge, but what the district judge has put in front of him on that report and recommendation is arguing about what the magistrate judge based the decision on, not on what the district court ultimately ruled upon. Now, theoretically, the materials were there, but at what point were they addressed to the district court? The brief weren't addressed the first time, and he didn't give an opportunity the second time. The briefing was before the district court. The briefing was there. He was available to him to review when the case was back to remand. There's no procedural requirement. I think it would be the district court's discretion whether he felt he needed, based upon the papers that were before him, whether he felt he needed any further briefing. 56F expressly says that there is to be an opportunity given for people to respond before there's a ruling. How is that complied with in this case? 56F, I believe, is limited to the additional filing for a motion for summary judgment. I'm aware of no case that says 56F requires re-notice after a case is remanded when the issues have been fully briefed in the first instance. Are you not aware of any of the opposite where there's a statement that you don't have to do that? No, I'm not aware of that either, but I believe that would be in the district court's discretion whether he felt he needed further briefing. This is a scenario where Mr. Witherell had no opportunity to respond to present arguments. This was fully briefed, fully noticed, and he had a chance to present those arguments, and yet he hasn't presented any prejudice here about why his first briefing was inadequate. Unless the court has any other questions. My colleague has questions. Thank you very much. Thank you for your argument. Counsel, do you want to use some of your remaining time to reply with an eloquent statement? I would certainly like to attempt, if I may. Do we have a second to ask Mr. Witherell a question? May I just ask him a question? Unusual, but sure, if that would be helpful to you. The question that the court had applied upon my counsel and colleague was, was this thing fully briefed? Was there a mistake in discovery? Was state in this case early on, and Mr. Witherell was precluded from conducting certain discoveries, so there's no way the state can say that it was fully briefed. Was there an objection to the first summary judgment motion brought a few years ago on the grounds that there was an inadequate basis to proceed, there wasn't sufficient discovery? The subsection letter has changed, so I forget what it is now, but there is a provision in Rule 56 that says if you've got to respond to summary judgment and you haven't had an opportunity to develop facts, you state an objection based on that. Was there such an objection? There was an objection filed, but not being a filer of that objection, I couldn't certify the content. When you say there was an objection filed, are you talking about objections to the magistrate judge's opinion or objections prior to the magistrate reaching the questions? I'm certain that there was an objection filed to the magistrate's important recommendation, and I'm hoping that there wasn't, that the issue of the discovery was stated, was included in that, but I can't certify it. Thank you. Is there anything else you want to say? Thank you, Your Honor. Thank you. Thank you to both counsel for their argument. The case just argued is submitted.
judges: Clifton, M. Smith, Erickson